DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

Christopher R. Kaup, Esq. (SBN 014820)
David M. Barlow (SBN 035812)

**TB** **TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
E-Mail: crk@tblaw.com, dmb@tblaw.com

*Proposed Attorneys for Neuragenex Treatment Centers, LLC*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | (Chapter 11 Proceeding) |
| **NEURAGENEX TREATMENT CENTERS, LLC** | Case No. 2:24-bk-00631-EPB |
| Debtor. | **DECLARATION OF DON HULKE IN SUPPORT OF FIRST DAY MOTIONS** |

I, Don Hulke, depose and say under penalty of perjury:

1.      I am, and at all times mentioned herein was, a citizen of the United States, over the age of 21 years.

2.      I give this testimony herein, from my personal knowledge, except where otherwise indicated, and under penalty of perjury.

3.      I am the Chief Restructuring Officer of Neuragenex Treatment Centers, LLC ("Neuragenex" or the "Debtor").  A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit "A"

4.      As part of my duties as Chief Restructuring Officer, I have spoken at length with Will Bozeman, the Manager of the Debtor, Lance Goudzwaard, the Chief Administrative

Officer of the Debtor, and Eric Speer, the Chief Financial Officer of the Debtor. I have also talked at length and negotiated with Mr. Steve Holden, the principal of SARC USA, Inc. ("SARC"), and its affiliated entities, Mr. Steve Caton, an employee of SARC and its affiliated entities, and officers and employees of other landlords and creditors of Neuragenex. I have also spoken with Jerry Noble of Cushman & Wakefield. I have also worked on the worksheets and other material necessary for the preparation of the Bankruptcy Schedules and Statement of Financial Affairs, worked closely with Mr. Speer in preparing projections of the Debtor's operations to support the *Motion for Interim and Final Orders Authorizing Use of Cash Collateral* (the "Cash Collateral Motion") and the Debtor's Chapter 11 Plan of Reorganization (the "Plan") and worked closely with Chris Kaup, lead Counsel for the Debtor, in developing the Plan.

5.     As part of my duties as Chief Restructuring Officer, I have reviewed many of the leases of real property between the Debtor, SARC US, LLC ("SARC US") and its affiliates, and certain other landlords including United Growth Capital Management, LLC, and its affiliates and Millrock Investment Fund 1, LLC and 13 Investments Fund, LLC, and certain of the equipment leases and equipment financing agreements between Neuragenex and SARC and its affiliates and other lessors.

6.     As part of my duties as Chief Restructuring Officer, I have reviewed several of Neuragenex's historic and current financial records and related information, including accounts payable and accounts receivable reports, financial statements and balance sheets.

7.     I have reviewed the (1) *Application Employ Tiffany & Bosco, P.A. as Counsel for Debtor and Debtor-in-Possession* (the "T&B Application"); (2) *Application to Employ*

*Legion Financial, LLC as Chief Restructuring Officer* (the "Legion Application"); (3) *Motion to Pay Prepetition Wages* (the "Wage Motion"); (4) *Omnibus Motion to Reject Leases of Commercial Real Property with SARC US, LLC and Its Affiliates* (the "SARC Rejection Motion"); (5) *Motion to Reject Leases of Commercial Real Property with United Growth Capital Management, LLC and Certain of its Affiliates* (the "United Growth Rejection Motion"); (6) *Motion to Reject Leases of Commercial Real Property with (A) Millrock Investment Fund 1, LLC & 13 Investments, LLC; (B) The Grid at Mesa, LLC; (C) RWDI Maplewood, LP; (D) Clayton Real Estate Company, LLC; (E) J. Kirk Crawford and Virginia Crawford, Trustees of the Crawford Family Trust; (F) Multiple TIC Owners Managed by CAMs Realty; and (G) DMTM Investments, Inc.* (the "Other Landlords Rejection Motion"); (7) *Motion to Reject Executory Contract with Jameson, LLC* ("Jameson Rejection Motion"); (8) *Motion to Pay Certain Critical Vendors* (the "Critical Vendor Motion"); (9) *Motion For Determination Of Adequate Assurance Of Utility Companies, Approval Of Adequate Assurance Procedures And To Prohibit Utility Companies From Terminating Service* (the "Utilities Motion"); (10) *Motion for Interim and Final Orders Authorizing Use of Cash Collateral* (the "Cash Collateral Motion"*)*; (11) *Motion for Special Procedures for Payment of Estate Professionals* (the "Special Procedures Motion"); and (12) *Emergency Motion For Interim And Final Orders Under 11 U.S.C. §§ 105(A), 345 And 363 Authorizing (A) Maintenance And Use Of Debtors' Existing Bank Accounts And Cash Management System; And (B) Allowing Debtors To Continue Using Existing Business Forms* (the "Cash Management Motion"). The T&B Application, the Legion Application, the Wage Motion, the SARC Rejection Motion, the United Growth Rejection Motion, the Other Landlords Rejection

Motion, the Jameson Rejection Motion, the Critical Vendors Motion, the Utilities Motion and the Special Procedures Motion and are referred to hereinafter as the "First Day Motions."

### Factual Background Regarding the Debtor

8.     The Debtor provides medical pain treatment services to patients using innovative treatments without drugs or surgery through Neurofunctional Pain Management techniques in several states.

9.     I have interviewed and met with the Debtor's management to discuss its financial reporting, cash management system, and operating controls at its principal business and management offices;

10.     I also have reviewed the Debtor's financial projections regarding future operations, including a Cash Collateral Budget (the "Budget") covering a two-month period attached hereto as **Exhibit "B."**

11.     The Debtor's overall management of their operations is strong and consistent with standards in the industry. I found no material weakness in the management and operations of the entire enterprise.

12.     Neuragenex is managed and operated in a manner that is consistent with sound medical provider operations and financial management procedures and standards.

### Reasons for the Bankruptcy

13.     Based on my review of the materials referenced in ¶¶ 5 & 6 above and the conversations referenced in ¶ 4 above, I understand that there are two primary reasons that Neuragenex needed to seek relief under the Code. First, the Debtor is a party to a large number of leases of commercial real property that have rental rates which, I believe, are grossly above

market rental rates in the geographic regions in which those properties are located. Second, I understand that a critical vendor of the Debtor, Novo Health Technology Group, LLC ("Novo") was forced into an involuntary bankruptcy in the Eastern District of Wisconsin on April 4, 2023 (Case No. 2:2023-bk-21460) and terminated its services to Neuragenex which severely damaged the ability of the company to timely bill and receive payments from payors.

A.      Hyper-Inflated Leases.

14.      Shortly after the Debtor began its operations, Neuragenex entered into a Multi-Unit Development Agreement[1] (the "Development Agreement") with Jameson, LLC, doing business as American Development Partners ("ADP"), certain commercial real property leases with SARC US and a number of its affiliates, and certain equipment financing agreements and equipment leases with other affiliates of SARC.[2]

---

[1] The Development Agreement is the subject of a separate Motion to Reject Executory Contract filed by the Debtor substantially contemporaneously with the filing of this Motion.

[2] SARC, SARC US, SARC Draper, LLC ("SARC Draper"), SARC IL, LLC ("SARC IL"), SARC IL II, LLC ("SARC IL II"), SARC FL – Cape Coral, LLC ("SARC Cape Coral"), SARC FL – Clearwater, LLC ("SARC Clearwater"), SARC TN – Goodlettesville, LLC ("SARC Goodlettesville"), SARC FL – Lake Mary, LLC ("SARC Lake Mary"), SARC TN – LaVergne, LLC ("SARC LaVergne"), SARC GA – Lawrenceville, LLC ("SARC Lawrenceville"), SARC GA – Marietta, LLC ("SARC Marietta"), SARC Mansfield, LLC ("SARC Mansfield"), SARC IL – Naperville, LLC ("SARC Naperville"), SARC TN – Nashville, LLC ("SARC Nashville"). SARC IL – New Lenox, LLC ("SARC New Lenox"), SARC AZ – Prescott, LLC ("SARC Prescott"), SARC TX – Rowlett, LLC ("SARC Rowlett"), SARC FL – Tampa, LLC ("SARC Tampa"), SARC TX – Waco, LLC ("SARC Waco"), – SARC IL – Aurora, LLC ("SARC Aurora"), SARC IL – Buffalo Grove, LLC ("SARC Buffalo Grove"), SARC GA – Hiram, LLC ("SARC Hiram"), SARC IL – St. Charles, LLC ("SARC St. Charles"), SARC IL – Westmont, LLC ("SARC Westmont"), and SARC IL – Wheaton, LLC ("SARC Wheaton") are collectively referred to hereinafter as the SARC Entities.  The leases of commercial real property between the Debtor and certain of the SARC Entities are collectively referred to hereinafter as the SARC Leases.

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

15.     The Debtor also entered into certain leases of commercial real property with (a) United Growth Capital Management, LLC ("UGCM") for a property located in Glen Ellyn, IL; (b) a lease with UG ACM OLA McDonough, GA, LP ("UG McDonough") for a property located in McDonough, GA; (c) a lease with UG2 Avenues Walk NGX, FL, LP ("UG Avenues") for a property located in Jacksonville, FL; (d) a lease with UG ACM North Olmsted OH, LP ("UG North Olmsted") for a property located in North Olmsted, OH; (f) a lease with UG ACM Roswell GA, LP ("UG Roswell") for a property located in Roswell, GA.[3]

16.     The Debtor also entered into certain leases of commercial real property with (a) Millrock Investment Fund 1, LLC and 13 Investments Fund, LLC ("Millrock") for properties located in Bluffdale, UT, Cottonwood Heights, UT, Lehi, UT, and South Jordan, UT; (b) The GRID at Mesa, LLC ("The Grid"), for a property located in Mesa, AZ; (c) RWDI Maplewood, L.P. for a property located in Powder Springs, GA ("RWDI"); (d) Clayton Realty Company ("Clayton") for a property located in Clarksville, TN; (e) J. Kirk Crawford and Virginia Crawford, Trustees of the Crawford Family Trust ("Crawford Trust") for a property located in Alpharetta, GA; (f) Multiple TIC Owners Managed by CAMs Realty ("CAMs Realty") for properties located in  Kennesaw, GA, Naperville, IL and Romeoville, IL; and (g) DMTM Investments, Inc. ("DMTM") for property located in Suwanee, GA.[4]

---

[3] UGCM, UG McDonough, UG Avenues, UG North Olmsted and UG Roswell are referred to herein after as "United Growth." The leases of commercial real property between the Debtor and the United Growth are collectively referred to hereinafter as the "United Growth Leases."

[4] The Grid, RWDI, Clayton, Millrock, Crawford Trust, CAMs Realty and DMTM are collectively referred to hereinafter as the Other Landlords.  The leases of commercial real property between the Debtor and the Other Landlords are collectively referred to hereinafter as the "Other Landlords Leases."

17. In my opinion, based on my experience, the Development Agreement imposed on Neuragenex unrealistic and very burdensome growth requirements and costs. For example, Paragraph 2.a. states that "[Debtor] shall enter into **five hundred** (500) Lease Agreements …with anticipated development costs to be approximately $3,000,0000.00 a unit … for a total initial commitment of approximately $1,5000,000,000.00 and option for an additional $750,000,000.00."[5] The Development Agreement also stated that "[t]he term of this Agreement ("Term") shall commence on the Effective Date and shall terminate on the earlier of (i) the date that is ten (10) years after the execution of the Area Development Agreement and (ii) the date that [Debtor] satisfies the Tenant Commitment[.]"

18. The Development Agreement appears to require Neuragenex to enter into leases[6] for every "Qualified Project" presented to the Debtor by ADP. The formula for calculating Base Rent in the Development Agreement is incomprehensible to me.

19. Based on my review of the SARC Leases, the United Growth Leases and the Other Landlords Leases and my experience regarding commercial real property leases and my review and analysis of the reports prepared by Mr. Jerry Noble from Cushman & Wakefield, I understand and believe the rental amounts in the SARC Leases, the United Growth Leases and the Other Landlords Leases is three to five times higher than the market rental rates for similar spaces in the same cities, towns or regions.

---

[5] Although the Debtor committed to pay costs in this amount, the Development Agreement states that "actual costs will vary based on individual projects."

[6] The agreement provides that Neuragenex "shall enter into a lease agreement for the Property." *See* the Development Agreement, at § 3, attached hereto the as Exhibit Q.

20.     For example, a comparison between the rent in five leases with SARC Entities and one lease with United Growth (the lease of the space at the McDonough, GA location) and fair market rent in comparable buildings in the same communities based on reports prepared by Mr. Noble is set forth in the table below:

| Location | Rent Per Lease | Fair Market Rent | Fair Market Rent With Critical Assumptions[7] |
|---|---|---|---|
| 1470 Lawrenceville Hwy, Lawrenceville, GA | $40,729.50 per month | $9,697.50 per month | $15,606.51 per month |
| 3479 Hwy 81 East, McDonough, GA | $50,000 per month | $8,875.00 per month | $8,875.00 per month |
| 3590 East New York Street, Aurora, IL[8] | $30,093.00 per month | $7,165.00 per month | $8,901.32 per month |
| 1010 South 1100 West, Lehi, UT | $29,429.17 per month | $8,750.00 per month | $12,541.67 per month |
| 2101 Houston Highway, Victoria Texas | $49,049.56 per month | $10,650.00 per month | |
| 5901 West Waco Drive, Waco, TX | $47,759.39 per month | $11,272.00 per month | $20,665.33 per month |

21.     With the assistance of Mr. Noble, Messrs. Bozeman, Goudzwaard, and Speer we have identified properties in four communities, Lawrenceville, Georgia, Marietta, Georgia,

---

[7] Each of the Reports prepared by Jerry Noble of Cushman & Wakefield contains an analysis of fair market rent assuming each landlord actually performed all of the construction to build all of the improvements in each building. Mr. Noble points out, however, that the leases often do "**NOT** disclose any cost details necessary to establish rent as defined in paragraph 3 of the lease under the rent schedule, or in Exhibit "C" – Landlord Scope of Work." *See e.g.* Report on 1470 Lawrenceville Hwy, Lawrenceville, GA and 3479 Hwy 81 East, McDonough, GA., at p. 5, attached hereto as Exhibit R _(emphasis in original).

[8] Mr. Noble points out in his report about the lease of the Aurora Property, "There are other terms in the lease that are overreaching, in my opinion, and those are detailed within the

New Lenox, Illinois and Victoria Texas in which Neuragenex has clinics and is working to finalize leases for those properties with fair market rent substantially below the rent in the SARC Locations in those communities.

22. In total, there are thirty-one (31) SARC Leases, eight (8) United Growth Leases and fifteen (15) Other Landlords Leases.

23. Based on my extensive experience advising debtors in bankruptcy cases and other businesses and the reports prepared by and conversations with Mr. Noble, I believe the SARC Leases, the United Growth Leases and the Other Landlords Leases are burdensome and provide no benefit to the bankruptcy estate at the current lease rates.

24. Many of the SARC Leases are for locations which were never turned over to the Debtor and never occupied by Neuragenex. Prepetition, the Debtor actually occupied and conducted operations in eleven locations leased from SARC. The Debtor has ceased operations in and vacated eight of the spaces covered by the SARC Leases and is willing to abandon all of the remaining locations within the next four to eight weeks.

25. The Debtor has ceased operations in and vacated all of the spaces covered by the United Growth Leases.

26. The Debtor has ceased operations in and vacated all of the spaces covered by the Other Landlords Leases.

B. <u>Substantial Harm Resulting from a Vendor's Bankruptcy</u>.

---

summary." *See e.g.* Report on the Aurora Property, at p. 4, attached to the Hulke Declaration, at as Exhibit S.

27.     I understand and believe that the Debtor suffered a complete loss of data and systems required to operate, bill, and collect for services rendered in the normal course as a result of Novo's bankruptcy. Based on my review of the Debtor's financial records, it is clear that the operations and cash flow of Neuragenex were severely damaged by the loss of its electronic practice management system ("PM") and electronic healthcare records system ("EHR") caused by the involuntary bankruptcy of Novo.

28.     On May 3, 2023, an order for relief was entered. On or about July 13, 2023, as a consequence of Novo's bankruptcy, Neuragenex received notice that it would no longer have access to the critical systems and data on the servers operated by Novo by the end of July.

29.     As a result of the loss of access to data maintained in Novo's systems, the Debtor was required to move from digital files to paper files as a stop gap measure to ensure it could continue to operate if it lost access to its data and patient files. My understanding is that the required move to paper files led to substantial disruptions to operations and resistance from the Debtor's health care service providers and employees because paper files substantially increase the time required to document clinical care and process patient claims, and is more susceptible to human error and claim rejections.

30.     In late August 2023, the Debtor lost all remaining access to its data from Novo and, as a result, Neuragenex's ability to operate and submit for payment to payors, such as insurance companies, and collect for services rendered was significantly hindered. Employees of the Debtor were able to export the data prior to losing full access to Novo, with fifty percent of the data being exportable and the other half of the data requiring manual reconstruction. To date, the manual reconstruction of the data is complete, however, the quality control process to

identify and correct issues is ongoing. This work will continue for months as claims are submitted for reimbursement and data is verified.

31. I have substantial experience working with other medical providers in financial distress. Based on that experience, I know medical billing is extremely complicated and varies by state, by payor, and other variables and the loss of access to data and the resulting gross inefficiencies in billing and collections cause substantial damage and operational harm to affected providers. Without data and systems in place to manage the process, it becomes almost impossible to manage and timely submit claims for reimbursement.

32. As I understand, the full extent of the damage has not yet been determined because Neuragenex only recently completed the manual input of data required to estimate accounts receivable generated during this period and is in the process of submitting claims for reimbursement.

### Prepetition Efforts to Restructure Operations

33. Based on my experience and knowledge turning around troubled businesses, Mr. Speer, Mr. Bozeman, Mr. Goudzwaard and I made and implemented numerous decisions to restructure the company's business operations and address mounting financial problems caused by the termination of their agreement with Novo as a result of that company's bankruptcy and the grossly above market leases. Those actions, including closing eleven locations, reducing expenditures on supplies and equipment, and laying off over 55 employees, to substantially reduce expenses. As a result of those decisions, I understand that the Debtor has saved over $11,700,000.00 on an annualized basis.

**Equipment Agreements**

34.     I am aware that Debtor entered into several documents titled either "Equipment Financing Agreements" or "Equipment Lease Agreements" (collectively the "Equipment Agreements") with certain of the SARC Entities between March 2022 and April 2023.  The SARC Entities who financed the Debtor's acquisition of medical equipment are:  SARC, SARC IL – Aurora, LLC, SARC US. LLC, SARC IL – Westmont, LLC, SARC IL. LLC. SARC IL II, LLC, SARC IL – Wheaton, LLC, SARC IL – Buffalo Grove, LLC, SARC GA – Hiram, LLC, SARC FL – Clearwater, LLC, SARC TN – Goodletsville, LLC, SARC TN – LaVergne, LLC, SARC GA – Marietta, LLC, SARC AZ – Mesa, LLC, and SARC IL – St. Charles, LLC (collectively the "SARC Equipment Lenders").

35.     Each of the Equipment Agreements relate to equipment that Debtor utilized or planned to utilize in the operations of its business at various locations.

36.     The Equipment Agreements with the SARC Equipment Lenders reference the specific equipment acquired by Debtor and financed by these creditors.

37.     The Equipment Agreements with the SARC Equipment Lenders define "Equipment Cost" on either page 1 or page 2.

38.     Each of the Equipment Lease Agreements provide for "Annual Interest" of 16.5% *per annum* and "Advanced Funds Interest."

39.     Paragraph 6.1 provides that Debtor "has selected and approved of the type, quantity and supplier of each item of Equipment as described on the Invoices[.]"

40.     Paragraph 23 in each of those agreements provides that Debtor may purchase the equipment upon expiration of the full term of the lease for a mere $500.00.

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

41.     Debtor granted a security interest in the equipment it was acquiring in favor of the SARC Equipment Lenders by Paragraph 25 in each of the Equipment Lease Agreements.

42.     The Debtor agreed to pay for equipment over time with interest at very high rates (16.5% *per annum* in each of the Equipment Lease Agreements and 33% *per annum* in the Equipment Financing Agreements).

43.     As to each of the Equipment Lease Agreements, Neuragenex becomes the owner after a lengthy lease term for a nominal payment.

44.     The Equipment Agreements with the SARC Entities also attach invoices as an exhibit in further support of the "Equipment Cost."

45.     Upon information and belief, on March 29, 2023, Debtor and SARC IL – Aurora, LLC entered into an Equipment Agreement for equipment that cost $1,015,124.00 that Debtor utilized in the operations of its business at its location in Aurora, Illinois ("Aurora Equipment Agreement"). The Aurora Equipment Agreement is attached hereto as **Exhibit "C."**

46.     Upon information and belief, on April 3, 2023, Debtor and SARC IL – Buffalo Grove, LLC entered into an Equipment Agreement for equipment that cost $1,015,124.00 that Debtor utilized in the operations of its business at its location in Buffalo Grove, Illinois ("Buffalo Grove Equipment Agreement"). The Buffalo Grove Equipment Agreement is attached hereto as **Exhibit "D."**

47.     Upon information and belief, Debtor and SARC entered into an Equipment Agreement for equipment that cost $871,455.00 that Debtor utilized in the operations of its

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

business at its location in Cape Coral, Florida ("Cape Coral Equipment Agreement"). The Cape Coral Equipment Agreement is attached hereto as **Exhibit "E."**

48.     Upon information and belief, on March 27, 2023, Debtor and SARC FL – Clearwater, LLC entered into an Equipment Agreement for equipment that cost $923,419.00 that Debtor utilized in the operations of its business at its location in Clearwater, Florida ("Clearwater Equipment Agreement"). The Clearwater Equipment Agreement is attached hereto as **Exhibit "F."**

49.     Upon information and belief, on March 22, 2023, Debtor and SARC TN – Goodlettsville, LLC entered into an Equipment Agreement for equipment that cost $871,455.00 that Debtor utilized in the operations of its business at its location in Goodlettsville, Tennessee ("Goodlettsville Equipment Agreement"). The Goodlettsville Equipment Agreement is attached hereto as **Exhibit "G."**

50.     Upon information and belief, on March 29, 2023, Debtor and SARC GA – Hiram, LLC entered into an Equipment Agreement for equipment that cost $1,015,124.00 that Debtor utilized in the operations of its business at its location in Hiram, Georgia ("Hiram Equipment Agreement"). The Hiram Equipment Agreement is attached hereto as **Exhibit "H."**

51.     Upon information and belief, on June 7, 2022, Debtor and SARC entered into an Equipment Agreement for equipment that cost $871,455.00 that Debtor utilized in the operations of its business at its location in Lawrenceville, Georgia ("Lawrenceville Equipment Agreement"). The Lawrenceville Equipment Agreement is attached hereto as **Exhibit "I."**

52.     Upon information and belief, on March 20, 2023, Debtor and SARC GA – Marietta, LLC entered into an Equipment Agreement for equipment that cost $871,455.00 that

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

Debtor utilized in the operations of its business at its location in Marietta, Georgia ("Marietta Equipment Agreement"). The Marietta Equipment Agreement is attached hereto as **Exhibit "J."**

53. Upon information and belief, on June 7, 2022, Debtor and SARC entered into an Equipment Agreement for equipment that cost $1,364,415.00 that Debtor utilized in the operations of its business at its location in New Lenox, Illinois ("New Lenox Equipment Agreement"). The New Lenox Equipment Agreement is attached hereto as **Exhibit "K."**

54. Upon information and belief, on April 3, 2023, Debtor and SARC IL II entered into an Equipment Agreement for equipment that cost $1,015,124.00 that Debtor utilized in the operations of its business at its location in North Aurora, Illinois ("North Aurora Equipment Agreement"). The North Aurora Equipment Agreement is attached hereto as **Exhibit "L."**

55. Upon information and belief, on April 3, 2023, Debtor and SARC IL – St. Charles, LLC entered into an Equipment Agreement for equipment that cost $1,015,124.00 that Debtor utilized in the operations of its business at its location in St. Charles, Illinois ("St. Charles Equipment Agreement"). The St. Charles Equipment Agreement is attached hereto as **Exhibit "M."**

56. Upon information and belief, on April 3, 2023, Debtor and SARC entered into an Equipment Agreement for equipment that cost $871,455.00 that Debtor utilized in the operations of its business at its location in Victoria, Texas ("Victoria Equipment Agreement"). The Victoria Equipment Agreement is attached hereto as **Exhibit "N."**

57.     Upon information and belief, on December 9, 2022, Debtor and SARC entered into an Equipment Agreement for equipment that cost $871,455.00 that Debtor utilized in the operations of its business at its location in Waco, Texas ("Waco Equipment Agreement"). The Waco Equipment Agreement is attached hereto as **Exhibit "O."**

58.     The aggregate cost of equipment according to the Equipment Agreements and attached invoices was $12,592,184.

### Insurance

59.     Neuragenex currently has insurance coverage on all of its personal property as well as malpractice insurance and other standard insurance for a business of this type.

### T&B Application

60.     Mr. Bozeman and I have selected T&B as Counsel for Debtor for the reason that Christopher Kaup and David Barlow have extensive experience in matters of this type, including the representation of debtors in Chapter 11 bankruptcy cases and I believe that Messrs. Kaup and Barlow and T&B are well qualified to represent it in this proceeding. Furthermore, I believe that it is in the best interest of the Debtor and the Bankruptcy Estates for Debtor to retain T&B and Messrs. Barlow and Kaup.

61.     I am informed and believe that T&B and Messrs. Kaup and Barlow have no connection with Debtor, creditors, or any other party in interest except as set forth below and in the Statement of Christopher R. Kaup, Pursuant to Rule 2014 & 2016 filed contemporaneously with this declaration.

62.     I am informed and believe that T&B and Messrs. Kaup and Barlow do not hold or represent an interest adverse to the estates with respect to the matters on which they are

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

employed and are disinterested as that term is defined in 11 U.S.C. § 101, and hold no interest adverse to the interests of the Bankruptcy Estate.

## Legion Application

63.   The Debtor hired my firm, Legion Financial, LLC on September 30, 2023 to advise Messrs. Bozeman, Goudzwaard and Speer about the multiple financial and operation problems confronting the company due to the matters set forth above and assist in developing a plan to restructure Neuragenex's operations and obligations including the leases with the SARC Entities and its other landlords and certain equipment financing agreements and equipment leases. I was retained by Debtor as the Chief Restructuring Officer on December 22, 2023.

64.   I have substantial knowledge and experience advising officers of companies addressing complex problems while in financial distress including in bankruptcy proceedings. A summary of my experience and other *bona fides* is set forth in my *Curriculum Vitae*, a copy of which is attached in **Exhibit "A".**

65.   I have no connection with Debtor, creditors, or any other party in interest except as set forth in the Statement, Pursuant to Rule 2014 & 2016, filed contemporaneously with an Application to Employ me and my firm, Legion Financial, LLC.

66.   Legion Financial, LLC, and I do not hold or represent an interest adverse to the estates with respect to the matters on which we are to be employed and are disinterested as that term is defined in 11 U.S.C. §101, and hold no interest adverse to the interests of the Bankruptcy Estate.

**The Wage Motion**

67. As of November 1, 2023, Neuragenex employed 133 persons in fifteen cities who provided pain management medical services to patients in fifteen clinics.

68. The Debtor currently employs 58 persons (56 fulltime employees and two part-time employees). The Debtor closed seven clinics and laid off 55 full time employees on November 14 and 15, 2023, reducing its bi-weekly payroll to $300,000.00 plus $16,000.00 in 401(k) contributions. It closed four more clinics and laid off approximately 28 more employees on January 19, 2024.

69. Based on my extensive experience assisting and advising companies experiencing financial distress including business in Chapter 11, the payment of wages, salaries, and benefits to Neuragenex's remaining employees on the dates payroll is normally set to issue is essential to the continued operations of the Debtor and its reorganization in this case.

70. Based on my extensive experience assisting and advising companies experiencing financial distress including business in Chapter 11, a failure to pay employees for all of their prepetition wages, salaries, and benefits will harm the morale of employees, and may cause employees to leave Neuragenex at a time when their services are critical to the successful reorganization of the company. In addition, the employees are likely to suffer severe financial difficulties if they are not paid on time. The claim of each such employee that is currently employed is less than $15,105.00. The Debtor has sufficient funds available for the payment of the employee wages and the payment of those wages will benefit not harm or deplete Debtor's estate.

71.     The next payroll period for Debtor starts on Sunday, January 28, 2024.  The next payroll that is due to the employees must be paid on Friday, February 2, 2024 and covers the work period from Sunday, January 14, 2024 through Saturday, January 27, 2024. A true and correct copy of the of the payroll reports for Debtor's employees during this period is attached hereto as Exhibit "P."

**The SARC Rejection Motion**

72.     I have reviewed the major lease terms for the leases the Debtor has in its possession with the SARC Entities for the locations Debtor opened.  Based on the information set forth above in ¶¶ 14 – 26, the reports from Jerry Noble at Cushman & Wakefield and my extensive experience advising business, including medical providers, it is my opinion that the rent in all of those leases is substantially above the market lease rates for properties in similar geographic areas.

73.     There are 31[9] SARC Leases; Debtor signed 26 of the SARC Leases; Debtor actually moved into 11[10] of the properties that are subject to the SARC Leases; Debtor did not occupy 20[11] of the properties that are subject to the SARC Leases.

---

[9] Based on my review of documents possessed by Debtor, Debtor attached all SARC Leases that it has in its possession and referenced all locations that Debtor actually moved into.

[10] Debtor moved into the following properties – Aurora, IL, Buffalo Grove, IL, Hiram, GA, Goodlettsville, TN, Lawrenceville, GA, Marietta, GA, New Lenox, IL, North Aurora, IL, St. Charles, IL, Victoria, TX, and Waco, TX.

[11] Debtor did not occupy the following properties – Cape Coral, FL, Carol Stream, IL, Clearwater, FL, El Paso, TX, Fox River Grove, IL, Lake Jackson, TX, Lake Mary, FL, LaVergne, TN, Lake Zurich, IL, Lufkin, TX, Mansfield, TX, Mundelein, IL, Naperville, IL, Nashville, TN, North Richland Hills, TX, Prescott, AZ, Rowlett, TX, Tampa, FL, Westmont, IL and Wheaton, IL.

74.     Mr. Noble has identified landlords willing to lease comparable properties to Neuragenex in the following cities Lawrenceville, Georgia, Marietta, Georgia, New Lenox, Illinois, and Victoria, Texas.

75.     The Debtor began the process of negotiating leases for four of those locations before the bankruptcy was filed and plans to finalize negotiations to occupy the space in those locations over the next eight weeks.[12]

76.     The cost of moving to these four locations will be far outweighed by the savings in rent and other costs the Debtor will achieve by rejecting the SARC Leases.

77.     I believe it is in the best interest of the Debtor to reject all of the leases with the SARC Entities unless the SARC Entities are willing to reduce the rental rates to market rent for the four locations that Debtor currently occupy.

78.     In the exercise of my business judgment, based on all of the information contained in this declaration, I have determined and decided that it is appropriate to reject the leases with the SARC Entities, if the lease rates cannot be negotiated down to a market rate.

### The United Growth Rejection Motion

79.     I have reviewed the major lease terms for the leases that Debtor has in its possession with the United Growth.  Based on the information set forth above in ¶¶ 14 – 26 and the reports from Jerry Noble at Cushman & Wakefield, I believe that the rent in all of those leases is substantially above the market lease rates for properties in similar geographic areas.

---

[12] Specifically, those four locations are as follows: Lawrenceville, GA, Marietta, GA, New Lenox, IL and Victoria, TX.

80.  There are eight United Growth Leases; Debtor actually moved into one[13] of the properties that are subject to the United Growth Leases; Debtor did not occupy seven[14] of the properties that are subject to the United Growth Leases.

81.  I believe it is in the best interest of the Debtor to reject all of the leases with United Growth.

82.  In the exercise of my business judgment, based on all of the information contained in this declaration, I have determined and decided that it is appropriate to reject the leases with United Growth.

### The Other Landlords Rejection Motion

83.  I have reviewed the major lease terms for the leases that Debtor has in its possession with (A) Millrock Investment Fund 1, LLC & 13 Investments, LLC; (B) The Grid at Mesa, LLC; (C) RWDI Maplewood, LP; (D) Clayton Real Estate Company, LLC; (E) J. Kirk Crawford and Virginia Crawford, Trustees of the Crawford Family Trust; (F) Multiple TIC Owners Managed by CAMs Realty; and (G) DMTM Investments, Inc. (collectively the "Other Landlords"). Based on the information set forth above in ¶¶ 14 – 26 and the reports from Jerry Noble at Cushman & Wakefield, I believe that the rent in all of those leases is substantially above the market rental rate in the same geographic area.

84.  There are fifteen Other Landlords Leases; Debtor actually moved into three[15] of the properties that are subject to the Other Landlords Leases; Debtor did not occupy twelve[16] of the properties that are subject to the Other Landlords Leases.

---

[13] Debtor moved into the property in McDonough, GA.

85. I believe it is in the best interest of the Debtor to reject the leases with the Other Landlords.

86. In the exercise of my business judgment, based on all of the information contained in this declaration, I have determined and decided that it is appropriate to reject the leases with the Other Landlords.

## Critical Vendor Motion

87. The Debtor is requesting permission to pay, in the ordinary course of business, the obligations identified below owed to the following creditors who are critical vendors which arose prior to the filing of the bankruptcy:

| **Vendor** | **Amount Due** | **Services or Goods** |
|---|---|---|
| CureMD | $41,309.00 | Provides hosting of all Debtor's medical records |
| FrontLine Cyber Solutions Corporation | $230,009.57 | Provides access to patient records and practice management software necessary for all billing functions |
| Healthcare Information Services, LLC | $568,500.00 | Provides revenue cycle management services to adjudicate claims and ensure accurate payment |

---

[14] Debtor did not occupy the following properties – Casselberry, FL, Glen Ellyn, IL, Hendersonville, TN, Jacksonville, FL, Mesa, AZ, North Olmsted, OH and Roswell, GA.
[15] Debtor moved into the following properties – Bluffdale, UT, Lehi, UT and Powder Springs, GA.
[16] Debtor did not occupy the following properties – Alpharetta, GA, Clarksville, TN, Cottonwood Heights, UT, Herriman, UT, Kennesaw, GA, Mesa, AZ, Orem UT, North Phoenix, AZ, Romeoville, IL, Solon, OH, South Jordan, UT and Suwanee, GA.

| Vendor | Amount Due | Services or Goods |
|--------|-----------|-------------------|
| Proximity Lab Services | $24,469.00 | Provides which allow the Debtor to bill for lab services and collect revenue |
| Quintessence Health | $120,779.45 | Provides software that allows the Debtor to bill insurance carriers and patients and maintains the schedules of the providers |
| Vital Signs Physician Resources | $22,331.50 | Provides services to assist the providers in maintaining compliance with the requirements of insurance carriers including the onboarding of new providers with existing insurance contracts |

88.    Based on my extensive experience assisting and advising companies experiencing financial distress including business in Chapter 11, my conversations with management, my review of all of the Debtor's financial records and my conversations with representatives of creditors, paying the proposed amounts to these creditors is necessary and appropriate in order to prevent the interruption in the supply of various goods and services that that are critical to providing ongoing pain management medical services to patients and maintaining the operation of the Debtor. Neuragenex seeks authority to pay in the ordinary course of business to the Critical Vendors listed above over periods of time to be negotiated with each creditor.

89.    In the exercise of my business judgment, it is appropriate for the Debtor to pay the Critical Vendors only if they agree to provide favorable post-petition credit or

payment terms. Additionally, to the extent that any of the Critical Vendors have imposed COD terms, the Debtor will only pay them if they agree to remove the COD requirements.

90. I do not expect that Neuragenex will make large, lump-sum payments to the Critical Vendors on account of all pre-petition invoices. Rather, we expect to reach agreement with the Critical Vendors to make a number of smaller payments on back invoices over time as part of reaching an overall agreement.

91. I believe the goods and services the Critical Vendors supply probably cannot be purchased from another source on the same or similar business terms. The Debtor also has confidence in the quality and reliability of their goods and services. Based on my experience advising medical providers, the supply of critical medical pain management services and efficient business operations will be interrupted and perhaps severely compromised if the Debtor is required to look for alternatives to the Critical Vendors.

92. Alternative vendors would take time to locate, negotiate and document new agreements with and cause substantial disruption to operations. I believe that new agreements with alternative vendors probably will result in significantly higher costs for Neuragenex. Alternative vendors may charge a premium in light of the perceived risk of doing business with a company in bankruptcy.

93. In the exercise of my business judgment, I believe that the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors, and other parties-in-interest.

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

1

**Utility Motion**

2          94.     Prepetition, the Debtor received utility service from various providers, including

3   services for, among other things, water, sewage, natural gas, electricity, telecommunications,

4   and similar utility services (collectively, the "Utility Services") from numerous utility

5   companies (collectively, the "Utility Companies").

6
          95.     These Utility Companies supply their services to the Debtor's clinics and
7
    business headquarters. Debtor relies on these utility services to conduct its business providing
8
9   pain management services to patients.

10         96.     A loss of services would cause immediate and substantial harm to Debtor and its

11  patients, severely hampering the Debtor reorganization prospects. All of Debtor's utility

12  service providers were paid in full on bills due as of the Petition Date, and will continue to be

13
    paid in the ordinary course of business going forward.
14
           97.     Debtor has substantial cash on hand and will be generating cash in the
15
16  bankruptcy cases.

17                              **Cash Collateral Motion**

18         98.     Based on my review of all of the Debtor's financial records and my extensive

19  experience advising companies in bankruptcy proceedings and my experience advising

20  medical providers, I prepared a Cash Collateral Budget covering a one-month period attached

21
    hereto as Exhibit "B."
22
           99.     I believe all of the information in the Cash Collateral Budget is reasonable and
23
24  achievable over that period.

25

26

100.    The aggregate value of all of the Debtor's cash, cash equivalents, and financial assets is $66,550.00.

101.    The aggregate value of all of the Debtor's deposits and prepayments is $18,684.50.

102.    The gross amount of accounts receivables is $11,786,467.34 and the collectible amount of receivables is $331,508.54.

103.    The aggregate value of all of the Debtor's inventory and supplies is $202,362.90.

104.    The aggregate value of all of the Debtor's office furniture, fixtures, and equipment and collectibles is $957,382.90.

105.    The aggregate value of all of the Debtor's medical equipment is $14,642,345.43.[17]

106.    In light of the fact the Debtor has largely overcome the problems caused by the loss of its data from Novo and is now operating with new electronic systems and due to the time of the year, it is my opinion that the amount of Neuragenex's receivables from the four locations that continue to operate will increase substantially over the next few months.

107.    The aggregate amount due and owing to SARC pursuant to its two promissory notes secured by all of the Debtor's assets is $2,250,0000.00.  The aggregate amount due and owing to FrontLine secured by all of the Debtor's assets is $324,411.69. The aggregate amount due and owing to Bozeman secured by all of the Debtor's assets is $227,000.00.    The

DocuSign Envelope ID: F4F6E829-5A70-443E-95E8-D26289263CE6

aggregate amount due and owing to Healthcare Information Services, LLC, secured by all of the Debtor's assets is $343,500.00. The aggregate amount due to United Growth, secured by all of the property of the Estate, is $100,000.00. The aggregate amount due to Millrock Investment Fund I, LLC, secured by all of the property of the Estate, is $50,000.00. The aggregate amount due to Mr. Mark Machlis, secured by all of the property of the Estate, is $50,000.00.

108. Below is a table showing the amount of equity in excess of each of the lenders liens in the assets of the Estate:

| **Lender** | **Amount of Equity Cushion**[18] |
|---|---|
| SARC | **$ 15,847,382.68** |
| FrontLine | **$ 15,522,970.99** |
| HIS | **$ 15,179,470.99** |
| United Growth | **$ 15,079,470.99** |
| Millrock | **$ 15,029,470.99** |
| Machlis | **$ 14,979,470.99** |

109. Based on my review of all of the Debtor's financial records and my extensive experience advising companies in bankruptcy proceedings and my experience advising medical providers, creditors holding security interests in those receivables are adequately

---

[17] This amount does not include the value of the equipment at the McDonough, Georgia, location which is covered by a lease with United Growth even though Debtor believes it owns those assets. This equipment is fully encumbered by a lien in favor of United Growth.

[18] For the purposes of the calculations of adequate protection contained in this motion, Debtor has not included the value of the equipment that is collateral for amounts due to United Growth under the lease of the real property in McDonough, Georgia owned by United Growth previously occupied by Debtor.

protected by the substantial equity cushion in their existing collateral and the granting of a replacement lien on future receivables.

I declare under penalty and perjury of the laws of the State of Arizona that the foregoing is true and correct and that this Declaration is executed by me on January 26, 2024 at Phoenix, Arizona.

DONALD HULKE